IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| KENNETH W. CARSTENS, <br><br> Plaintiff, <br><br> v. <br><br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | CIVIL NO.: 12-1335 (MEL) |

**OPINION AND ORDER**

**I.   PROCEDURAL BACKGROUND**

Kenneth W. Carstens ("plaintiff" or "claimant") was born in 1962, has completed high school, and was employed as a police officer until August of 2005. (Tr. 15, 72.) On August 25, 2008 plaintiff filed an application for Social Security Disability Insurance benefits, alleging disability due to "right wrist hand and pain, status post right hand injury" and "major depressive disorder." (Tr. 9, 11.) The alleged onset date of the disability was March 27, 2007. (Tr. 9). The end of the insurance coverage period was December 31, 2010. (Tr. 11.) Plaintiff's application was denied initially as well as on reconsideration. (Tr. 9.) After plaintiff's timely request was granted, a hearing took place before an Administrative Law Judge ("ALJ") on May 19, 2010. Id. On June 4, 2010, the ALJ rendered a decision denying plaintiff's claim. (Tr. 17.) The Appeals Council denied plaintiff's request for review on July 19, 2011; therefore, the ALJ's decision became the final decision of the Commissioner of Social Security (the "Commissioner" or "defendant"). (Tr. 1.)

On May 11, 2012, plaintiff filed a complaint seeking review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), alleging that it was not based on substantial evidence. (D.E. 1, at

2).  On September 19, 2012, defendant filed an answer to the complaint and a certified transcript of the administrative record (D.E. 5; 6).  Both parties have filed supporting memoranda (D.E. 17; 18).

## II. LEGAL STANDARD

### A. Standard of Review

Once the Commissioner has rendered his final determination on an application for disability benefits, a district court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing [that decision], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  The court's review is limited to determining whether the ALJ employed the proper legal standards and whether his factual findings were founded upon sufficient evidence.  Specifically, the court "must examine the record and uphold a final decision of the Commissioner denying benefits, unless the decision is based on a faulty legal thesis or factual error." López-Vargas v. Comm'r of Soc. Sec., 518 F. Supp. 2d 333, 335 (D.P.R. 2007) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam)).

Additionally, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).  The standard requires "'more than a mere scintilla of evidence but may be somewhat less than a preponderance' of the evidence." Ginsburg v. Richardson, 436 F.2d 1146, 1148 (3d Cir. 1971) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

While the Commissioner's fact findings are conclusive when they are supported by substantial evidence, they are "not conclusive when derived by ignoring evidence, misapplying

the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam) (citing Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) (per curiam); Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam)). Moreover, a determination of substantiality must be made based on the record as a whole. See Irlanda Ortiz, 955 F.2d at 769 (citing Rodríguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). However, "[i]t is the responsibility of the [ALJ] to determine issues of credibility and to draw inferences from the record evidence." Id. Therefore, the court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodríguez Pagán v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

### B.   Disability Under the Social Security Act

To establish entitlement to disability benefits, the claimant bears the burden of proving that he or she is disabled within the meaning of the Social Security Act. See Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 146-47 (1987). An individual is deemed to be disabled under the Social Security Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S. C. § 423(d)(1)(A).

Claims for disability benefits are evaluated according a five-step sequential process. 20 C.F.R. § 404.1520; Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999); Yuckert, 482 U.S. at 140-42. If it is determined that the claimant is not disabled at any step in the evaluation process, then the analysis will not proceed to the next step. At step one, it is determined whether the claimant is working and thus engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, then disability benefits are

denied. 20 C.F.R. § 404.1520(b). Step two requires the ALJ to determine whether the claimant has "a severe medically determinable physical or mental impairment" or severe combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If he does, then the ALJ determines at step three whether the claimant's impairment or impairments are equivalent to one of the impairments listed in 20 C.F.R. part 404, subpart P, appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). If so, then the claimant is conclusively found to be disabled. 20 C.F.R. § 404.1520(d). If not, then the ALJ at step four assesses whether the claimant's impairment or impairments prevent her from doing the type of work he or she has done in the past. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ concludes that the claimant's impairment or impairments do prevent her from performing her past relevant work, the analysis then proceeds to step five. At this final step, the ALJ evaluates whether the claimant's residual functional capacity ("RFC"),[1] combined with her age, education, and work experience, allows her to perform any other work that is available in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ determines that there is work in the national economy that the claimant can perform, then disability benefits are denied. 20 C.F.R. § 404.1520(g).

Under steps one through four, the plaintiff has the burden of proving that he cannot return to his former job because of his impairment or combination of impairments. Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989) (per curiam). Once he has carried that burden, the Commissioner then has the burden under step five "to prove the existence of other jobs in the national economy that the plaintiff can perform." Id.

---

[1] An individual's residual functional capacity is the most that he or she can do in a work setting despite the limitations imposed by her mental and physical impairments. 20 C.F.R. § 404.1545(a)(1).

### III.   THE MEDICAL EVIDENCE CONTAINED IN THE RECORD

#### A.   Evidence Related to Right Wrist

Plaintiff received treatment at Concentra Medical Centers in Newark, New Jersey, on May 21, 2004, through January 14, 2005, for an injury to his right wrist suffered while he was apprehending a suspect. (Tr. 371-77). By the end of this treatment period, he showed decreased grip strength and diffuse tenderness in his wrist, but no deformity, ecchymosis, or swelling, and a full range of motion with pain. (Tr. 377.)

Plaintiff then saw Dr. Roberto Lombardi ("Dr. Lombardi"), an orthopedic surgeon and hand and microsurgery specialist, on January 18, 2005 and February 15, 2005. (Tr. 310-11.) Dr. Lombardi reported that despite plaintiff's continued pain and tenderness to touch, X-ray films showed that the injury appeared to be healing well and he was unable to "find any objective evidence of any severe ongoing pathology . . . ." (Tr. 310.)

On May 17, 2005, plaintiff received a second opinion from Dr. Wayne J. Altman ("Dr. Altman"), also an orthopedic surgeon and hand and microsurgery specialist, who reviewed X-rays taken on March 21, 2005 which showed a "mild increase in the scapholunate distance," but otherwise appeared normal. (Tr. 313-14.) Dr. Altman also reviewed an MRI which showed "some mild narrowing in the scapholunate junction." (Tr. 314.) Dr. Altman, noted, however, that even if plaintiff did have a scapholunate injury, it could not explain his symptoms "in any way." Id. Dr. Altman recommended an operative arthoscopy of the wrist to treat any abnormality present in the wrist. (Tr. 314-15.)

Plaintiff visited Dr. Anju Rustagi ("Dr. Rustagi") on June 2, 2005 for a physical medicine rehabilitation consult for chronic right wrist pain. (Tr. 323.) Dr. Rustagi noted that plaintiff reported "pain over the lateral aspect of the wrist with flexion, extension, ulnar, and radial deviation" and that he felt numbness in the bottom of his right wrist. Id. Plaintiff also indicated

to Dr. Rustagi that he is independent in activities of daily living and ambulation. Id. Dr. Rustagi's physical examination indicated that there is no obvious swelling or deformity present, nor any sign of atrophy. (Tr. 324.) The examination also revealed "[a] range of motion of about 60 degrees plantar flexion, 45 degrees dorsiflexion, 30 degrees ulnar, and radial deviation with pain at end ranges." Id. Manual muscle testing appeared normal except for a "4+/ 5" in the hand intrinsics on the right side, sensation was intact, and muscle stretch reflex was symmetrical. Id. EMG nerve conduction study results dated June 9, 2005, showed no presence of right-sided ulnar neuropathy. (Tr. 319.)

On July 15, 2005, plaintiff underwent a right wrist arthroscopy surgery performed by Dr. Joseph T. Barmakian ("Dr. Barmakian"), who had begun treating plaintiff on March 31, 2005. (Tr. 405, 416-18.) The post-operative diagnosis was a partial tear of the schapholunate ligament in the right wrist. Id. On December 6, 2005, Dr. Barmakian indicated that plaintiff's wrist showed a slight increase in motion and strength, but no change in pain. (Tr. 394.) Dr. Barmakian expressed that he did not have an explanation for the pain and that therapy was ineffective. Id.

On January 16, 2006, Richard Ferraro, MSPT, ("Ferraro") conducted a functional capacity evaluation on plaintiff. (Tr. 336-41). Ferraro indicated that plaintiff "demonstrated the ability for medium category work (occasional work/lift at 50 lbs.)" with limited use of his right-upper exteremity. (Tr. 341.) The physical therapist also recommended that, due to the significant functional right-upper extremity issues faced by plaintiff, he should be "excused from work that requires him to respond to urgent/emergent situations or heavy physical activities." Id. Ferraro also recommended that plaintiff should not conduct prolonged and repetitive activities using his upper-right extremity. Id. Dr. Barmakian reviewed the results of the functional

6

capacity evaluation and discharged plaintiff, recommending that plaintiff could return to work, with modifications to avoid lifting more than 40 pounds, gripping with right hand, and responding to urgent situations where heavy use of right hand is required. (Tr. 386-41.)

Plaintiff was examined by Dr. David Rubenfield ("Dr. Rubenfield"), an orthopedic surgeon, on March 22, 2006. (Tr. 378-383.) Dr. Rubenfield reported the following limitations to the range of motion of plaintiff's right wrist: dorsiflexion of 30 degrees out of 60, palmarflexion of 20 degrees out of 70, radial deviation of 10 degrees out of 20, and ulnar deviation of 10 degrees out of 30. (Tr. 382.) Dr. Rubenfield also indicated that there was pain upon motion and tenderness radially, but no swelling. Id. Plaintiff's right hand showed no signs of atrophy, good grip strength, and a full range of motion. Id.

On December 17, 2008, Dr. Ramón Dávila ("Dr. Dávila"), an orthopedic surgeon, reported that plaintiff is unable to use his right hand for any work.[2] (Tr. 429.) Dr. Dávila indicated that plaintiff's right wrist dorsiflexion was 45 out of 60 degrees, his palmar flexion was 45 out of 70 degrees, and his ulnar deviation was 10 out of 30 degrees. (Tr. 423.) Plaintiff could achieve a full range of motion in the joints of his fingers and radial deviation of his wrist was normal. (Tr. 423-24.) Dr. Dávila indicated that plaintiff is unable to grip, grasp, pinch, finger tap, perform opposition of fingers, button a shirt, pick up a coin, or write with his right hand. (Tr. 429.)

---

[2] The nearly 3-year gap between Dr. Dávila's assessment during the disability period and all prior assessments of plaintiff's wrist before the alleged onset date is conspicuous. "While, certainly, it is not required that relevant medical evidence have been obtained during the period of disability, it is fair to state that the more remote such an examination and report is, the less importance it will have in the disability analysis." Lira v. Astrue, No. ED V 10-01280-VBK, 2011 WL 1743308, at *1 (C.D. Cal. 2011). The extent to which medical evidence prior to the disability period can be relied on has been addressed by other District Courts. Compare Id. at *2 (physician's report predating disability period by 14 years accorded less credibility because evidence likely stale) with Fowler v. Astrue, Bo. 09-1318-SAC, 2010 WL 4682277, at *5 (D. Kan. 2010) (Functional Capacity Evaluation predating onset date by 3 years could reasonably be relied on). Given the robustness of the medical record regarding plaintiff's wrist injury prior to the alleged onset date and its relevance to his physical symptoms during the disability period, it was reasonable for the ALJ to rely on such evidence when evaluating plaintiff's claim.

On February 4, 2009, Dr. Osvaldo Rivera ("Dr. Rivera"), an internist from the Disability Determination Program, completed a physical RFC assessment on plaintiff and reported that he could occasionally lift and/or carry 20 pounds, could frequently lift and/or carry 10 pounds, could stand and/or walk for about 6 hours a day, could sit for about 6 hours a day, and had an unlimited ability to push and/or pull. (Tr. 438.)  Dr. Rivera also reported that plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, and crouch, while he could occasionally crawl and climb ladders, ropes, and scaffolds. (Tr. 439.)  Additionally, Dr. Rivera noted that plaintiff had limited ability for gross manipulation and fine manipulation, but unlimited ability to reach in all directions. (Tr. 440.)  On August 19, 2009, Dr. Idalia Pedroza ("Dr. Pedroza"), also from the Disability Determination Program, reviewed plaintiff's medical files and concurred with Dr. Rivera's assessment. (Tr. 478.)

B.      **Mental Health Evidence**

Plaintiff began formal psychiatric treatment with Dr. Efrén Mangual ("Dr. Mangual") on March 27, 2007. (Tr. 160.)  Dr. Mangual diagnosed plaintiff on that date with severe and recurrent major depression without psychotic features. (Tr. 158, 160.)  At that time plaintiff was cooperative, logical, coherent, relevant, and oriented in person, place, and time. Id.  Plaintiff also demonstrated adequate attention, normal concentration, and preserved short- and long-term memory at that time. Id.  Dr. Mangual's progress notes in the record, dated between March 2007 and July 2008, show some fluctuation in plaintiff's attention, concentration, and perception of hallucinations, but consistently demonstrate him to be cooperative, logical, coherent, relevant, and oriented in person, place, and time. (Tr. 138-160.)  On May 14, 2009, Dr. Mangual completed a mental RFC assessment, indicating that plaintiff's mental RFC was marked or extremely limited which interferes markedly with his functional capacity. (Tr. 131-34, 136.)  Dr. Mangual indicated in his assessment that the limitations included in his RFC

8

assessment began on March 27, 2007, the alleged onset date. (Tr. 136.) An accompanying psychiatric evaluation by Dr. Mangual indicated a diagnosis of a severe and recurrent major depression with psychosis. (Tr. 130.) A medical questionnaire completed by Dr. Mangual on April 27, 2010, included a diagnosis of severe and recurrent major depression without psychosis. (Tr. 165-66.)

On November 5, 2008, Dr. Luis Rodríguez ("Dr. Rodríguez"), a clinical psychiatrist from the Disability Determination Program, completed a mental RFC assessment. (Tr. 365-67.) Dr. Rodríguez indicated that plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychological symptoms, in his ability to maintain attention and concentration for extended periods, and in his ability to perform activities within a schedule, maintain regular attendance, and be punctual. (Tr. 365-66.) Dr. Rodríguez also indicated that plaintiff was moderately limited in his ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism. (Tr. 366.) Dr. Rodríguez opined that plaintiff was not significantly limited in any other measure assessed. (Tr. 365-66.) On May 28, 2009, Dr. Jesús de Soto ("Dr. de Soto"), also from the Disability Determination Program, reviewed plaintiff's medical files and concurred with Dr. Rodríguez's assessment. (Tr. 476.)

## IV.  ANALYSIS

### A.  ALJ's Physical RFC Finding

Plaintiff argues that the ALJ erred in concluding that plaintiff was capable of engaging in light work, alleging that this conclusion is unsupported by any medical source on record that provides a medical assessment. (D.E. 17, at 17). The ALJ determined that plaintiff's physical RFC allowed him "to perform light work … [and] use the right dominant hand for exclusively for gross manipulations …." (Tr. 12.) In reaching this conclusion, the ALJ considered the RFC

assessment conducted by Dr. Rivera and affirmed by Dr. Pedroza, which showed that plaintiff can engage in "medium work with standing, walking and sitting for 6 hours in an 8 hour workday, occasionally climb ladders, ropes, and scaffolds, occasionally crawling and limited handling and fingering." (Tr. 14.) The ALJ indicated that he gave less weight to these State Agency medical consultants' opinions because "the objective medical evidence on the record and the medical expert testimony support the finding that the plaintiff is limited to light work." Id. Plaintiff claims that, because Dr. Rivera and Dr. Pedroza's RFC assessment indicates that plaintiff could engage in medium work, the ALJ's determination of a capacity for light work is unsupported by the medical evidence on record and therefore the ALJ has attempted to translate raw medical evidence into residual capacity himself. (D.E. 17, at 17).

This argument is unpersuasive. Although plaintiff correctly notes that a hearing officer, as a lay person, cannot interpret raw medical data to make an RFC determination himself, Manso-Pizarro, 76 F.3d at 17, in the instant case the ALJ had substantial evidence to determine that plaintiff was physically capable of light work based on medical opinions that had interpreted the raw data. Medical evidence from plaintiff's treating physicians prior to the alleged onset date sheds light in this regard.[3] Dr. Lombardi indicated that he could not find any evidence of a severe ongoing pathology that could explain plaintiff's symptoms in his wrist. (Tr. 310.) Likewise, Dr. Altman was also unable to find an objective explanation for plaintiff's symptomatology. (Tr. 314, 394.) The results of an EMG nerve conduction study also showed no presence of an ulnar neuropathy. (Tr. 319.) Based on his examination and review of plaintiff's

---

[3] Evidence outside of the disability insurance period is ordinarily irrelevant but for those instances in which it can shed some light on claimant's conditions during said period of time. Cf. Padilla Pérez v. Sec'y of Health & Human Servs., 985 F.2d 552, 1993 WL 21064, at *5 (1st Cir. 1993) (unpublished) ("Medical evidence generated after a claimant's insured status expires may be considered for what light (if any) it sheds on the question whether claimant's impairment reached disabling severity *before* his insured status expired." (emphasis in original)).

medical history, Dr. Rubenfield held the opinion that plaintiff was totally and permanently disabled to perform the duties of his job. (Tr. 382.) Dr. Dávila, who examined plaintiff after the alleged onset date, was of the opinion that plaintiff was unable to grip, grasp, pinch, finger tap, perform opposition of fingers, button a shirt, pick up a coin, or write with his right hand. (Tr. 429.) The ALJ, however, implicitly gave less weight to this finding by noting that Dr. Dávila reported no limitations in the range of motion of the claimant's right hand and that a January 2009 X-ray "only revealed mild to moderate degenerative changes" in plaintiff's right wrist. (Tr. 14-15.)

Dr. Rivera and Dr. Pedroza were not the only practitioners on record to have completed an RFC assessment. Physical therapist Ferraro's RFC assessment conducted on January 16, 2006 indicates that plaintiff "demonstrates ability for any work *up to* Medium category…." (Tr. 340.) (emphasis added.) By definition, an RFC finding of medium work includes the ability to perform light work as well. 20 C.F.R. § 404.1567(c). Moreover, despite having received less weight from the ALJ, the opinions of Dr. Rivera and Dr. Pedroza, the state agency consultants, are in fact consistent with a finding of light work, as they indicate that plaintiff is able to occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds. (Tr. 438.)

In determining that plaintiff was even more limited than the opinions of Ferraro, Dr. Rivera, and Dr. Pedroza, the ALJ evidently gave plaintiff some credit for his statements regarding pain in his right wrist, despite the fact that the objective medical evidence documented by Dr. Altman, Dr. Barkmakian, Dr. Lombardi, and the EMG nerve conduction study was unable to determine an explanation for plaintiff's symptoms. (Tr. 13.) The fact that the ALJ gave plaintiff the benefit of the doubt in concluding that plaintiff's physical RFC was more limited than the physicians' RFC assessment should not be used to discount the ALJ's determination.

See, e.g., Dampeer v. Astrue, 826 F. Supp. 2d 1073, 1085 (N.D. Ill. 2011) (ALJ incorporating additional limitations in medical evidence to determine claimant's RFC for sedentary work, when physicians concluded he could do light work, gave claimant benefit of the doubt and arrived at an RFC supported by substantial evidence).

### B. Failure to Give Controlling Weight to Treating Psychiatrist's Opinion

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of his treating psychiatrist, Dr. Mangual, and gave undue weight to that of the state agency medical consultants, Dr. Rodríguez and Dr. de Soto. (D.E. 17, at 11-15, 20-21). The ALJ implicitly did not give controlling weight to Dr. Mangual's mental RFC assessment, noting that "[e]ven though the psychiatrist reported the claimant's mental residual functional capacity as markedly to extremely limited which interferes markedly with the claimant's mental capacity, his progress notes demonstrated that most of the time the claimant has been logic [*sic*], coherent, relevant, oriented in the three spheres, with good memory and without diminished cognitive capabilities." (Tr. 14.) Additionally, the ALJ indicated that he gave "great weight" to opinion of the state agency clinical psychologists, because "the medical evidence established that most of the time the claimant has been logic [*sic*], coherent, relevant, oriented in the three spheres, with good memory and without diminished cognitive capabilities." (Tr. 15.)

In a Social Security disability case, an ALJ should generally give more weight to a treating physician's opinions, because such doctors "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(d)(2). An ALJ should "give controlling weight to the opinions of treating physicians if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record." Id. An ALJ, however, may disregard them with a showing of good cause: "(1) that they are brief and

conclusory, (2) not supported by medically acceptable clinical laboratory diagnostic techniques, or (3) are otherwise unsupported by the record." Carrasco v. Comm'r of Soc. Sec., 528 F.Supp.2d 17, 25 (D.P.R. 2007). An ALJ should "'always give good reasons' for the weight [he] gives a treating source opinion." Soto-Cedeño v. Astrue, 380 F. App'x 1, 3 (1st Cir. 2010) (quoting 20 C.F.R. § 404.1527(c)(2)).

The ALJ in the instant case gave "good reasons" to give less than controlling weight to the RFC assessment completed by Dr. Mangual. In particular, the ALJ noted that Dr. Mangual's own progress notes were inconsistent with his finding that plaintiff's mental residual functional capacity dating back to March 27, 2007 was markedly to extremely limited, because the notes had consistently shown plaintiff to be logical, coherent, relevant, oriented in the three spheres, with good memory and without diminished cognitive capabilities. (Tr. 15, 138-160.) Additionally, Dr. Mangual's RFC assessment conflicts with the subsequent mental RFC assessments conducted by Dr. Rodríguez and Dr. de Soto, who only found moderate limitations in plaintiff's "ability to maintain attention and concentration for extended periods," "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," "ability to interact appropriately with the general public," and "ability to accept instructions and respond appropriately to criticism from supervisors," but found plaintiff to be not significantly limited in any of the many other measures assessed. (Tr. 365-66.)

Plaintiff also argues that the ALJ's emphasis on the claimant appearing coherent, logical, relevant, and fully oriented in the three spheres with adequate memory was inappropriate, given

13

that a medical diagnosis of major depressive disorder does not require any of these attributes to be lacking. (D.E. 17, at 10-11). Indeed, the medical definition of a major depressive disorder requires either a depressed mood or a markedly diminished interest in or pleasure in almost all activities, as well as four other symptoms from among a list that includes "(1) changes in appetite or weight, sleep, and psychomotor activity; (2) decreased energy; (3) feelings of worthlessness or guilt; (4) difficulty thinking, concentrating, or making decisions; or (5) recurrent thoughts of death, suicidal ideation plans or attempts." Fennell v. Astrue, No. 2:09cv714, 2010 WL 5419015, at *8 n.15 (W.D. Pa. 2010) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 349-56 (4th ed. 2000)). However, the ALJ in the instant case did not deny that Dr. Mangual's diagnosis of a major depressive disorder was correct; rather, he stated that Dr. Mangual's finding that plaintiff's *mental residual functional capacity* was markedly to extremely limited was inconsistent with Dr. Mangual's own progress notes, which consistently indicate that plaintiff had been logical, coherent, relevant, oriented in the three spheres, with good memory and without diminished cognitive capabilities. (Tr. 15.) The ALJ indicated that plaintiff's severe impairments included a major depressive disorder (Tr. 11) but found that plaintiff's statements regarding intensity, persistence, and limiting effects were not credible. (Tr. 15.) Instead, the ALJ found that plaintiff had moderate restrictions in activities of daily living, moderate difficulties with social functioning and concentration, persistence and pace, and no evidence of episodes of decompensation of extended duration. (Tr. 12.) These findings are not inconsistent with the conclusion that plaintiff can perform light work and non-complex tasks. See, e.g., Clavijo Miranda v. Comm'r of Social Security, No. 11-1923 (SEC), 2013 WL 135181 (D.P.R. 2013) (claimant with major depressive disorder has RFC for light work except for complex tasks).

### C. Accuracy of Hypotheticals Posed to Vocational Expert

Plaintiff further argues that the hypothetical posed to the vocational expert did not accurately reflect Dr. Mangual's reports and notes or the consultant psychiatrists' reports. (D.E. 17, at 2). For an ALJ to rely on the testimony of a vocational expert, it must be sufficiently related to plaintiff's actual impairments. See Arocho v. Sec'y of Health & Human Services, 670 F.2d 374, 375-76 (1st Cir. 1982).

The ALJ's hypothetical to the vocational expert asked:

> . . . an individual with the same work experience, age, and the same academic and vocational profiles as the claimant, and, an individual whose maximum exertional capacity is light and whose maximum capacity relating to his right hand, which is his dominant hand, is heavy manipulation; whose maximum mental capacity is to perform repetitive and simple tasks . . . [a]re there any jobs in the regional or national economy that an individual with these characteristics could perform?

(Tr. 26-27.) The vocational expert found that an individual in such circumstances could have jobs such as garment sorter and tagger/ticketer, which require simple and repetitive tasks and involve light work. (Tr. 27.)

Plaintiff argues that the ALJ "swept aside the reports and progress notes of the treating and examining psychiatric sources of record" and failed to include relevant information from these sources in the hypothetical posed to the vocational expert. (D.E. 17, at 3). The only treating psychiatric physician on record is Dr. Mangual. In considering what type of information plaintiff would have wanted incorporated in the hypothetical, it is instructive to look at the hypothetical question posed by plaintiff's counsel in the hearing before the ALJ. Plaintiff counsel's hypothetical incorporated several findings of Dr. Mangual's mental RFC assessment; namely, that plaintiff had severely and marked limitations in his functioning, and that plaintiff's "cognitive deterioration . . . difficulty in making decisions . . . social withdrawal, and emotional ability" would interfere with his capability to perform a job. (Tr. 28.) The vocational expert

15

found that under such circumstances, an individual would not be able to function in any competitive job. Id.

Although an ALJ must tailor his hypotheticals to describe a claimant's limitations, he does not have to present any limitations that have been found not credible. See Rossi v. Shalala, No. 95–1045, 66 F.3d 306, 1995 WL 568492, at *4 (1st Cir. Sept. 25, 1995) (unpublished table decision). The hypothetical questions posed to the vocational expert "need only reasonably incorporate[] the disabilities *recognized by the ALJ*." Vélez-Pantoja v. Astrue, 786 F. Supp. 2d 464, 469 (D.P.R. 2010) (emphasis in original) (quoting Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994)). As stated above, the ALJ properly gave less weight to Dr. Mangual's mental RFC assessment because of the inconsistencies between his assessment and his progress notes.

Plaintiff's contention that the consulting physicians' opinions were not incorporated into the hypothetical are similarly unfounded. Dr. Rodríguez's assessment, with which Dr. de Soto concurred, indicates that plaintiff is able to remember and carry out simple and detailed instructions, has fair concentration and his memory is preserved, and can sustain attention for two hour intervals. (Tr. 367.) Based on this assessment it would be fair for the ALJ to conclude that plaintiff was capable of completing repetitive and simple tasks.

### D. Conclusory Nature of State Agency Consultants' Mental RFC Assessments

Plaintiff also contends that the state agency medical consultant's mental RFC assessments did not provide specific reasons for their opinions, referring to the First Circuit's opinion in Berríos López v. Sec'y of Health and Human Services, 951 F.2d 427 (1st Cir. 1991). (D.E. 17, at 21). Berríos López stands for, *inter alia*, the principle that a non-testifying, non-examining physician's report alone cannot be considered substantial evidence if the report only consists of "little more than brief conclusory statements or the mere checking of boxes."

Berríos-López at 431. Although Dr. Rodríguez's assessment does appear to fit this description, it is not the sole piece of evidence relied on by the ALJ. As mentioned above, the ALJ found that Dr. Rodríguez's and Dr. de Soto's assessments were corroborated by a review of Dr. Mangual's progress notes.

Plaintiff additionally claims that, pursuant to SSR 96-8p, state agency consultants must include a "discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." (D.E. 17, at 21) (citing SSR 96-8p, 1996 WL 374184 (July 2, 1996)). The portion of SSR 96-8p referred to by plaintiff, however, explains the narrative discussion requirements for the *adjudicator* in making his RFC assessment, not for medical consultants' assessments. SSR 96-8p. The ALJ in the instant case did acknowledge why the functional limitations presented in Dr. Mangual's RFC were inconsistent with the medical evidence, while those in Dr. Rodríguez's and Dr. de Soto's assessments were consistent.

## V. CONCLUSION

Based on the foregoing analysis, the Court concludes that the Commissioner's decision was based on substantial evidence. Therefore, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 26th day of June, 2013.

s/Marcos E. López<br>
U.S. Magistrate Judge